IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 4, 2024

## IN RE LEILANI G.

**Appeal from the Chancery Court for Maury County**
**No. A-049-20      M. Caleb Bayless, Judge**

_____

**No. M2022-01744-COA-R3-PT**

_____

A mother appeals the termination of her parental rights to her child. The chancery court found clear and convincing evidence of two statutory grounds for termination. The court also determined termination was in the child's best interest. After a thorough review, we agree and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

John M. Schweri, Columbia, Tennessee, for the appellant, Desirae C.

P. Marlene Boshears, Franklin, Tennessee, for the appellees, Damien G. and Tiffany G.

## OPINION

### I.

### A.

Damien G. ("Father") and Desirae C. ("Mother") are the parents of one child, born in August 2018. Initially, the unmarried parents shared residential parenting time by agreement, with the child primarily residing with Mother. But in March 2019, Father petitioned a juvenile court to establish parentage, residential parenting time, and child support. He separately moved for Mother to submit to a drug test. After hearing testimony

from both Mother and Father, the court ordered Mother to submit to a hair follicle drug examination.[1]

When Mother's drug test results returned positive for marijuana, methamphetamine, and amphetamines, Father moved for temporary custody of the child, which the court granted. It allowed Mother specific hours of parenting time each week, to be supervised by Father at a public setting, with the option for additional supervised parenting time as agreed between them. The court also opted to treat the matter as a dependency and neglect action. *See* Tenn. Code Ann. § 37-1-117(b)(1) (Supp. 2023).

Eventually, the juvenile court adjudicated the child dependent and neglected based on Mother's positive drug test. And it ordered the child to remain in Father's custody. The Department of Children's Services ("DCS") opened a family support services case for Mother. Until DCS could set up supervised parenting time for Mother, the court ordered Father to continue supervising Mother's visitation. According to Mother, she exercised parenting time "religiously twice weekly" under DCS supervision.

But, in October 2019, the juvenile court's agreed dispositional order ended DCS's family support services case. The court granted Mother ten hours per month of supervised visitation, which was to take place "at Camelot or other agency at Mother's cost." The parties could also agree to additional visitation.

In September 2020, Mother filed a "petition for re-establishing a parenting plan" in the juvenile court. She had not exercised any visitation since DCS closed its case. Among other things, her petition alleged that Father "ha[d] made no efforts to let Mother see her child," "ha[d] made no efforts to communicate with [a particular supervisory agency] regarding Mother's [v]isitation," and had sent Mother a video of the child in a dog cage. She contended that these were material changes in circumstances that warranted modification of parenting time.

Also in September 2020, Father married Tiffany G. ("Stepmother"). On October 1, 2020, they petitioned for termination of Mother's parental rights and adoption by Stepmother. So proceedings on Mother's petition to re-establish a parenting plan were suspended. *See id.* § 36-1-116(f)(2) (Supp. 2020).

B.

At the trial on the petition to terminate, the court heard from a DCS case worker, Mother, Father, Stepmother, Stepmother's boss and two brothers, Mother's employer, and the paternal grandmother of Mother's other child.

---

[1] By agreement, the juvenile court established Father's paternity of the child and set a temporary parenting schedule.

Much of the testimony focused on Mother's visitation with the child. Her last in-person visit with the child prior to the termination petition had taken place in October 2019, before DCS closed its case. Mother claimed that supervised visitation was cost prohibitive once DCS was no longer paying for supervision. She asked Father to supervise her visits with the child. But he was unwilling to do so and responded that Mother should pay for third-party supervision as the court ordered. Mother testified that she did not contact any agency to set up visitation until, at the earliest, possibly April 2020. In August 2020, she notified Father that she was attempting to set up visitation through an agency that could offer reduced rates. Despite Mother's complaints about the cost of visitation, she took multiple trips out of state between 2019 and 2021.

Mother did not talk to the child via phone or video chat throughout the case. She explained that she did not ask Father for permission to speak with the child because she "thought he wouldn't let [her]." But Mother testified that neither Father nor Stepmother interfered with her ability to have supervised visitation through an agency.

After Father filed the termination petition, Mother set up virtual supervised visitation through an agency. But her visitation remained inconsistent, sometimes with several weeks passing between visits. The child called Mother "that lady" or "that lady on the computer." And the child was confused by Mother's demands that the child call her "Mom" or "Mommy." Mother repeated these demands despite multiple reprimands from the supervising agency and the guardian ad litem. Based on these behaviors and uncertainty regarding Mother's current drug use, the court eventually suspended her visitation.

Mother testified that "there was no [drug] addiction problem" at any time. Using methamphetamine was "a one-time, stupid mistake." She did not feel she needed to go to a drug treatment program, but she attended outpatient treatment "because [she] was told [she] needed to go there." Neither she nor the DCS caseworker had evidence that she completed an alcohol and drug assessment or subsequent recommendations. According to Mother, "they told [her] [she] had completed the program" and released her from further appointments. The DCS caseworker testified that Mother tested positive for THC more often than not while the family support services case was open. The court admitted evidence that Mother would have tested positive for marijuana around the time she filed for a parenting time modification in the juvenile court. And Mother tested positive for marijuana again in August 2021. Still, Mother claimed at trial to "have been drug-free probably over a year . . . two years, maybe."

Mother admitted that she had lied about her drug use under oath in two previous court hearings. But she provided evidence that she passed a drug screen approximately eight months before trial. Her employer and the paternal grandmother of her other child testified to her character, but neither was aware that Mother had tested positive for drugs.

3

Father testified that the child had been living with him, Stepmother, and four stepsiblings. He described Stepmother as "the only mother that [the child] has known." And Stepmother "does pretty much everything" for the child, including "taking her to school, picking her up, taking her to doctor visits, dentist visits . . . ." According to Stepmother's boss, who spent time with the family, the child had a "loving and caring" relationship with her step-siblings. Stepmother explained that she loved the child "no differently than I love any of my other children." For her part, Mother agreed that Father and Stepmother testified truthfully.

The trial court concluded that Father and Stepmother established by clear and convincing evidence two grounds for termination of Mother's parental rights: abandonment by failure to visit and failure to manifest an ability and willingness to assume custody of the child. And it determined that termination of Mother's parental rights was in the child's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody their child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2020).

Tennessee Code Annotated § 36-1-113 describes both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one statutory ground for termination. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c)(1). If they prove the existence of one or more statutory grounds, they then must prove that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 546). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn.

4

1992).  It produces a firm belief in the fact-finder's mind regarding the truth of the facts sought to be established.  *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise."  *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d).  We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim."  *In re Bernard T.*, 319 S.W.3d at 596-97.  We review the trial court's conclusions of law de novo with no presumption of correctness.  *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

On appeal, Mother challenges both the grounds for termination of her parental rights and the determination that termination was in the child's best interest.

1. Abandonment by Failure to Visit

The trial court found by clear and convincing evidence that Mother abandoned the child by failing to visit her.  *See* Tenn. Code Ann. § 36-1-113(g)(1).  In termination of parental rights cases, a parent has abandoned their child when, "[f]or a period of four (4) consecutive months immediately preceding the filing of a . . . petition to terminate the parental rights of the parent . . . ," the parent failed to visit the child.  *Id.* § 36-1-102(1)(A)(i) (Supp. 2020).

The record establishes that Mother failed to visit the child a single time during the relevant time period.  However, the court concluded that Mother raised the affirmative defense that her lack of visitation was not willful.[2]  *See* Tenn. Code Ann. § 36-1-102(1)(I).  A parent who raises this defense must prove it by a preponderance of the evidence.  *Id.*  Merely filing her "petition for re-establishing a parenting plan" was insufficient, especially in light of evidence that Mother would have tested positive for marijuana around that time.  *See In re Adoption of Angela E.*, 402 S.W.3d 636, 642 (Tenn. 2013) (explaining that parent who filed a petition to reinstate visitation but took no further action was not actively trying to maintain visitation); *cf. In re Adoption of A.M.H.*, 215 S.W.3d at 810 (holding that a parent who "actively pursued legal proceedings to regain custody . . . during the 'abandonment' period" did not willfully fail to visit).  Here, Mother has made a variety of excuses: the cost of supervised visitation was prohibitive, Father declined to supervise

---

[2] Father and Stepmother argue that Mother did not properly plead the affirmative defense.  Because Mother failed to establish a lack of willfulness, we need not reach this issue.

visitation, she had difficulty communicating with an agency that could offer reduced rates, and the Covid-19 pandemic made setting up visitation a challenge.

Despite Mother's complaints about the cost of supervised visitation, she was consistently employed and went on numerous trips. *See In re Savanna C.*, No. E2016-01703-COA-R3-PT, 2017 WL 3833710, at \*12 (Tenn. Ct. App. Aug. 31, 2017) (recognizing "a parent's failure to visit can be willful even though the parent was required to pay a fee to visit his or her child at a private facility responsible for supervising the visits"). Mother admitted that she did not attempt to set up visitation through an agency before the Covid-19 pandemic. She ultimately attended some visitation while Covid-19 was impacting the community. And she testified that neither Father nor Stepmother interfered with her ability to set up visitation with an agency. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (explaining that a person's acts may justifiably excuse the parent's failure to visit "only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child"). The evidence does not preponderate against the trial court's findings that Mother had the capacity to visit, made no attempt to do so, and had no justifiable excuse for not doing so. *See In re Mattie L.*, 618 S.W.3d 335, 348 (Tenn. 2021).

2. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court also found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if she both "[1] failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody . . . of the child, and [2] placing the child in the [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

The evidence clearly and convincingly supports the trial court's determination that Mother failed to manifest an ability to personally assume custody of the child. Although Mother repeatedly claimed she was willing to assume custody, she had not seen, called, or video-chatted with the child for nearly a year before the termination petition was filed. When she finally re-established visitation, her visits were sporadic, and she did not bond with the child. She continued to demand that the child refer to her as "Mom" or "Mommy" despite multiple reprimands. Eventually, the court suspended visitation based on these behaviors and uncertainty regarding Mother's drug use. Mother continued testing positive for drugs approximately ten months after filing of the termination petition. And the trial court found she lacked credibility based on her repeated statements that she never had issues with drugs, her lies under oath in previous court proceedings, and her lack of transparency to her own character witnesses.

6

The evidence is equally clear and convincing that placing the child in Mother's custody would pose a significant risk of substantial psychological harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at \*17 (Tenn. Ct. App. July 22, 2020) (reasoning that returning the child to a "virtual stranger" in light of his strong bond with his current caregivers would constitute substantial harm). The child was nine months old when removed from Mother's custody. The child was over four years old at the time of trial. She had bonded with Father and Stepmother; she called Mother "that lady." Mother admitted that the child had formed a healthy parental attachment to Stepmother and that Mother's reintroduction to the child may affect the child's stability.

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). In making a best interest determination, courts consider a nonexclusive list of statutory factors. *See* Tenn. Code Ann. § 36-1-113(i). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, … the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

Here, the court made its determination of the child's best interests using the current list of twenty statutory factors. *See* Tenn. Code Ann. § 36-1-113(i) (2021). But those factors did not take effect until April 22, 2021, after the filing of the termination petition. *See* 2021 Tenn. Pub. Acts 509 (ch. 190). The best interest determination should have been made using the former list of nine statutory factors. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017) (holding the version of termination statute "in effect at the time of the petition's filing controls"). Despite the use of the wrong factors, we have noted that "the old factors are essentially contained within the new factors." *See In re Bralynn A.*, No. M2021-01188-COA-R3-PT, 2022 WL 2826850, at \*9 (Tenn. Ct. App. July 20, 2022); *see also In re Da'Moni J.*, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at \*23 (Tenn. Ct. App. Jan. 25, 2022). And, using the court's factual findings, we are able to review the court's best interest determination.

The first two statutory best-interest factors examine the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1) (Supp. 2020). The second factor considers the potential for lasting change "after reasonable efforts by

7

available social services agencies." *Id.* § 36-1-113(i)(2). The trial court found that Mother had taken advantage of available programs to assist in adjusting her conduct, but not until "some time" after DCS closed her family support services case. And although Mother testified that she completed drug classes, she stated that she never had a drug issue. The court found it significant that Mother "failed drug screens over a significant period of time" and lied about her drug use while under oath in prior proceedings.

The third factor considers whether the parent consistently maintained visitation or other contact with the child. *Id.* § 36-1-113(i)(3). The court found that Mother had not maintained regular visitation "once DCS was no longer paying the bill" for supervised visitation. She did not ask for phone calls or video chats with the child until after Father's petition was filed. Even then, her visitation was inconsistent.

The fourth factor asks whether "a meaningful relationship" has been established between parent and child. *Id.* § 36-1-113(i)(4). The court noted that the Mother "ha[d] not had any memorable relationship with the child in years." The child referred to Mother as "that lady" and was negatively impacted by Mother's insistence that the child call her "Mom." Mother admitted it "would be very difficult to introduce her at this time."

The fifth factor considers the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The child had lived with Father and Stepmother for over three years by the time of trial. The court found that the child had significant relationships with her Stepmother, who had taken a maternal role in the child's life, and her step-siblings. Thus, a "change of caretakers for the minor child would be difficult."

The sixth factor asks whether the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." *Id.* § 36-1-113(i)(6). The court had removed the child from Mother's custody due to drug use, and the court was concerned that Mother may not have made a lasting adjustment of circumstance based on her refusal to admit to previous drug issues.

The seventh factor looks at whether the parent's home environment is healthy and safe. *Id.* § 36-1-113(i)(7). The court found that the Mother generally had demonstrated an "understanding of the basic and specific needs for the child" with the "potential exception" of further drug issues. But Mother "was still experiencing difficulties with drugs nearly a year after the filing of the petition."

8

The eighth factor evaluates whether the parent's mental or emotional status prevents proper parenting. *Id.* § 36-1-113(i)(8). The court was "concerned" about Mother's "mental and emotional fitness" for two main reasons. Mother believed that the child should call her "Mom" even though it negatively impacted the child. And Mother refused to admit to previous drug issues despite the evidence.

Lastly, the ninth factor examines the parent's child support history. *Id.* § 36-1-113(i)(9). The court found that Mother paid child support.

The evidence does not preponderate against the trial court's findings. And we conclude there was clear and convincing evidence that termination was in the child's best interests. The child had bonded with her Father, Stepmother, and step-siblings. She was also thriving in their home. Mother, however, had difficulty acknowledging the significance of her prior drug use. And she failed to visit the child regularly or to maintain a bond with the child once others were no longer paying for services.

### III.

We affirm the termination of Mother's parental rights. The record contains clear and convincing evidence to support two statutory grounds for termination. And we conclude that terminating Mother's parental rights was in the child's best interest.

s/ W. Neal McBrayer
W. NEAL MCBRAYER, JUDGE

9